# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTHONY R. TURNER,

    Plaintiff,

  vs.

CALIFORNIA FORENSIC MEDICAL
GROUP, et al.,

    Defendants.

No. 2:09-cv-3040-GEB-CMK-P

FINDINGS AND RECOMMENDATIONS

       Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983.  This action proceeds on plaintiff's amended complaint (Doc. 18).  Pending before the court is defendants' unopposed motion for summary judgment.[1]

## I.  BACKGROUND

       The court has summarized plaintiff's claims as follows:  Plaintiff alleges in his complaint that following an unlawful stop and arrest, wherein he alleges he was subjected to unlawful excessive force by the arresting police officer, plaintiff was delivered to the Yolo

---

[1] The moving defendants include Carolyn Viera, Janeene Barela, John Zil, Lisa Miguel-Sevall, Tammy Owens and William Douglas.  Defendants Malagoni, Deneau, Hundl, and Brace, who are represented by separate counsel, did not join in the motion.

1

County Jail.  Upon deliverance at the jail, plaintiff alleges he was denied medical treatment, suffered additional use of excessive force, and was denied due process related to his placement in administrative segregation.  He claims the basis for his mistreatment was retaliation for filing a complaint related to his mistreatment.

Relating to the moving defendants, plaintiff alleges the nurses, identified in the complaint[2] as Tammy, Genine, Carolyn, and Lisa, failed to follow the doctors' orders and provide plaintiff with necessary medical care.  In addition, he alleges Dr. Zil failed to obtain his mental health records, properly evaluate him, and provide necessary treatment.  Finally, he alleges Dr. Douglas failed to provide necessary treatment including proper pain medication.

Specifically, plaintiff alleges that on September 22, 2009, he was seen by Dr. Douglas in the jail clinic for his injuries and pain, but that Dr. Douglas refused to provide a proper assessment and ordered Vicodin which plaintiff was allergic to. He further alleges that between September 23, 2009 and October 9, 2009, the nursing staff failed to administer the treatment Dr. Douglas did order.  The nursing staff failed to change the dressing on his injuries, failed to provide anti-bacterial cream, and failed to fill the prescription ordered.  (See Am. Compl., Doc. 18, at 15-19).  Further, plaintiff alleges Dr. Zil refused to obtain his mental health records, and from September 18, 2009 until November 5, 2009, he refused to evaluate and treat plaintiff's bi-polar disorder.  (See Am. Compl., Doc. 18, at 20-21).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

///

---

[2] The nurses, identified in the complaint as Tammy, Genine, Carolyn, and Lisa, have identified themselves as Carolyn Viera, Janeene Barela, Lisa Miguel-Sevall, and Tammy Owens.  As the claims against these individuals are similar in nature, the court may also refer to them as "the nurses" or "the nursing staff."

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III.  DISCUSSION

Defendants' unopposed motion for summary judgment is based on res judicata and the absence of any genuine issue of fact. Defendants argue plaintiff litigated the same claims in another action before this court, wherein judgment was entered against him. Thus, he is cannot re-litigate them here under the doctrine of res judicata. In addition, defendants argue the treatment provided plaintiff while in the jail was adequate, and there is no evidence of the defendants' deliberate indifference.

<u>Res Judicata</u>

Two related doctrines of preclusion are grouped under the term "res judicata." See <u>Taylor v. Sturgell</u>, 553 U.S. 880, 128 S. Ct. 2161, 2171 (2008). One of these doctrines – claim preclusion – forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." <u>Id.</u> Stated another way, "[c]laim preclusion. . . bars any subsequent suit on claims that were raised or could have been raised in a prior action." <u>Cell Therapeutics, Inc. v. Lash Group, Inc.</u>, 586 F.3d 1204, 1212 (9th Cir. 2009). "Newly articulated claims based on the same nucleus of facts are also subject to a res judicata finding if the claims could have been brought in the earlier action." <u>Stewart v. U.S. Bancorp</u>, 297 F.3d 953, 956 (9th Cir. 2002). Thus, claim preclusion prevents a plaintiff from later presenting any legal theories arising from the "same transactional nucleus of facts." <u>Hells Canyon Preservation Council v. U.S. Forest Service</u>, 403 F.3d 683, 686 n.2 (9th Cir. 2005).

The party seeking to apply claim preclusion bears the burden of establishing the following: (1) an identity of claims; (2) the existence of a final judgment on the merits; and (3) identity or privity of the parties. See <u>Cell Therapeutics</u>, 586 F.3d at 1212; <u>see also</u> <u>Headwaters, Inc. v. U.S. Forest Service</u>, 399 F.3d 1047, 1052 (9th Cir. 2005). Determining whether there is an identity of claims involves consideration of four factors: (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions. See <u>ProShipLine, Inc. v. Aspen Infrastructure Ltd.</u>, 609 F.3d 960, 968 (9th Cir. 2010). Reliance on the first factor is especially appropriate because the factor is "outcome determinative." <u>Id.</u> (quoting <u>Mpoyo v. Litton Electro-Optical Sys.</u>, 430 F.3d 985, 987 (9th Cir. 2005)). As to privity of the parties, "privity . . . [arises] from a limited number of legal relationships in which two parties have identical or transferred rights with respect to a particular legal interest." <u>Headwaters, Inc. v. U.S. Forest Serv.</u>, 399 F.3d

1047, 1053 (9th Cir. 2005).

The defendants move for summary judgment on the basis that the claims against them have been previously adjudicated, and plaintiff is now precluded from proceeding on those claims. Specifically, Dr. Douglas and the nursing staff defendants argue that the claims against them were adjudicated in action 2:09cv3445-GEB-KJN. In that other action, the nursing staff defendants were dismissed by Judge Newman upon screening, for plaintiff's failure to state a claim. The claims Judge Newman read in the complaint plaintiff filed in that case related to the inmate grievance system, and the nurses' obstruction of his ability file a grievance. Plaintiff was provided an opportunity to amend his complaint, which he failed to do. Therefore, the nursing defendants were dismissed from that action. In this action, upon screening, the undersigned found plaintiff stated a claim against the nursing staff defendants relating to the denial of medical treatment, not any claim relating to the inmate grievance system. Therefore, the undersigned does not agree with the defendants' argument that the claims raised in this action against the nursing staff have already been adjudicated.

However, the claims against Dr. Douglas in this action do appear to be duplicative of those raised and adjudicated in plaintiff's other case, 2:09cv3445-GEB-KJN. In both cases, plaintiff alleges Dr. Douglas failed to provide him with proper medical care, including failing to prescribe proper pain medication and refusing to change the dressings on his injuries, all in violation of his Eighth Amendment rights. These claims arise out of the same transactional nucleus of facts, involve infringement of the same right, the evidence presented in both actions are substantially the same, and the rights established in the prior judgment would be destroyed by a judgment in this action. Thus, there is an identity of the claims in the two separate actions. In addition, final judgment on the merits of the claims against Dr. Douglas exists in the other case, which was entered prior to the filing of the current motion. Thus, the undersigned finds the claims against Dr. Douglas in this action are barred by res judicata.

/ / /

Eighth Amendment Claims

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Dr. Zil

Plaintiff's alleges Dr. Zil refused to obtain his mental health records, and failed to treat his mental disorders. Defendants argue there is no evidence to support plaintiff's contention that Dr. Zil's treatment fell below the standard of care, let alone violated plaintiff's Eighth Amendment rights. In support of their motion, defendants refer to the declaration of Dr. Jason Roof to support their contention that the care and treatment provided by Dr. Zil was within the applicable standard of care. In his declaration, Dr. Roof states:

> 1. I an a medical doctor licensed to practice medicine in the State of California since March 2,1 2007. . . .
>
> 2. I have been board certified in General Psychiatry, with added qualifications in Forensic Psychiatry, since 2009. I have previously served on the American Psychiatric Association's Patient Safety Committee and an currently the site director for medical student and resident psychiatric

education at the Sacramento County Jail.  In my practice I have provided inpatient and outpatient psychiatric care to thousands of inmate patients, including those with diagnoses of Bipolar Disorder, Schizophrenia, Schizoaffective Disorder and Substance Abuse/Dependence.  I have lectured to nurses, medical students, resident physicians, physicians, law enforcement and attorneys since 2006 on a variety of subjects related to Psychiatry.

3.  I have received and reviewed the jail medical charts from Yolo County Jail for Mr. Turner's incarceration in 2009, including psychiatric records, medical records and hospital records related to his vehicular accident in 2009.  I have also reviewed records related to his prior mental health treatment in parole outpatient clinic.

4.  The following chronology describes and defines the contact between Mr. Turner and the mental health staff at the Yolo County Jail in 2009:

A.  Mr. Turner was initially seen at intake by the Yolo County Jail mental health staff and specifically psychiatric nurse Kathy Sindelar on September 18, 2009.  The psychiatric nurse recorded at the time a reported history by Mr. Turner including the use of Geodon and Lithium, these are psychiatric drugs, "yesterday" and that the pharmacy where he obtained his medications was "Valley."
. . .
C.  The psychiatric nurse appropriately sought on September 18 to determine if Mr. Turner actually had a current, active prescription for the medications that Mr. Turner reported he had been taking and the nurse found in checking with the local pharmacies in Woodland that there was no record of any such prescription at "Raleys, Longs, Rite Aid or Walgreens. . . ."

D.  In addition to confirming the absence of any current valid prescription at the local pharmacies, the psychiatric nurse, Ms. Sindelar, also performed a nursing assessment of Mr. Turner's condition at intake and noted that Mr. Turner's thoughts were, "organized" and that he was without noted "formal delusions" or hallucinations; the psychiatric nurses assessment as entered in the chart was that Mr. Turner was suffering from an "antisocial personality disorder."  Mr. Turner's case was referred to the then Jail psychiatrist, Dr. Zil;

E.  Mr. Turner's inmate records were reviewed by Dr. Zil on September 22, 2009, noting a history of polysubstance abuse, a prior motor vehicle accident (records from UC Davis Medical Center were subsequently received and reviewed); Dr. Zil's initial assessment based on the information presented to him was that Mr. Turner was suffering from a mood disorder related to his polysubstance abuse.  This assessment was quite proper given the information available to Dr. Zil at the time and a further review was set for October 13, 2009;

///

///

F. The psychiatric nurse further assessed Mr. Turner's condition on October 2, 2009, in response to his complaint that he was not "getting his psych meds;"

G. A further review of the records was performed by Dr. Zil on October 6, 2009, and included further references to the history of the use of methamphetamines, marijuana and hallucinogens;

H. On October 14, 2009, Dr. Zil noted that if the inmate would cooperate, that there would be a further evaluation on October 15, 2009. The note indicates that the inmate "refused to acknowledge" the reasons for his incarceration . . . . Mr. Turner was described as "irritable," "argumentative" and not amenable to the doctor's approach. In an effort to gain further information, Dr. Zil ordered the retrieval of records relating to prior incarceration at the Yolo County Jail and, immediately for further efforts to be made by the jail medical staff to determine if there were "clearly" any records indicating that the patient had current prescriptions by psychiatrist for medications as of the time of incarceration;

I. On October 16, 2009, the psychiatric nurse reiterated that as of the time of the incarceration of Mr. Turner there was no record at the Woodland pharmacies identified by the plaintiff as the location where he filled his prescriptions, of any prescription for psych medications;

J. On October 21, 2009, Dr. Zil had received and reviewed the earlier volumes related to the previous incarceration of Mr. Turner at the Yolo County Jail that did show the historical use of psych medications and Dr. Zil planned to meet with the psych nurse and ultimately the plaintiff to assess the interaction;

K. After a meeting with the psych nurse and further review of historical records on October 28, 2009, there was a decision by Dr. Zil to prescribe psychiatric medications including Navane and Lithium and that if further assessment were to find a valid prescription by a psychiatrist for Geodon for Mr. Turner within the prior 60 days, that medication could be provided as well;

. . .

M. The search for records verifying the report by Mr. Turner on intake at the Yolo County Jail in September 2009 were both appropriate and necessary and within the standard of care. It would have been inappropriate and potentially damaging to provide psychotropic medications without the search for confirming records. No such confirmation was available at the time of booking or for several days thereinafter; good medical practice required the kind of investigation "by the mental health staff at the Yolo County Jail" with the ultimate prescription of psychotropic medications by Dr. Zil after that necessary process had been completed.

///

> N. Based on my review of the medical and psychiatric records from California Forensic Medical Group, Inc., the psychiatric care provided by J.S. Zil, M.D., J.D., and the psychiatric staff at the Yolo County Jail, complied with the applicable standard of care with which I am familiar as a practicing physician in this state with particular training and experience in Psychiatry.

(Decl. of Jason G. Roof, M.D., Doc. 77 at 1-5).

Defendants have met their burden to show Dr. Zil did in fact review plaintiff's records and provided treatment to plaintiff, including psychotropic medications determined to be necessary. The treatment Dr. Zil provided was determined to be within the applicable standard of care, thus shifting the burden to plaintiff. As the motion is unopposed, plaintiff offers nothing to counter this evidence, or otherwise support his claims. Therefore, the undersigned will recommend that defendant Zil be granted summary judgment.

<u>Nursing Staff</u>

Plaintiff alleges the nursing staff refused to provide him the treatment prescribed by the doctors. He claims the nurses failed to change his wound dressing and give him the pain medication as prescribed.

Defendants again argue there is no evidence to support plaintiff's contention that the nurses failed to follow the doctor's orders, or that their treatment fell below the standard of care, let alone violated plaintiff's Eighth Amendment rights. In support of their motion, defendants refer to the declarations[3] of Dr. John Levin. In his original declaration, Dr. Levin states, in relevant part:

> 1. I have been board certified in Emergency Medicine since 1991 and have been a member of the Emergency Medicine Committee at Arcadia Methodist Hospital as a [sic] well as a member of the Paramedic/Liaison Advisory Committee. In my practice I have lectured paramedics, nurses and medical students since 1986 with respect to emergency medicine and

---

[3] Dr. Levin also submitted his declaration in support of the defendants' motion for summary judgement in case 09cv3445. That declaration, as well as a supplemental declaration from Dr. Levin are both submitted in support of the current motion. (Supp. Decl. of John Levin, M.D., Doc. 78).

11

other topics. I am familiar with and have been involved in the care and treatment of patients with traumatic injuries that have involved post-accident infections, lacerations, skin grafts for closure of such lacerations and the prescriptions of appropriate antibiotic therapy and pain medication as indicated.

2. I have received and reviewed the jail medical charts from Yolo County Jail for Mr. Turner's incarceration in 2009, including the medical record reports and testing results for UC Davis Medical Center for Mr. Turner following his vehicular accident in 2009.

3. Mr. Turner was brought to the UCD Medical Center emergency room by ambulance (referred to in this chart as "BIBA") following a reported rollover vehicular accident ("MVA") on August 21, 2009, at 8:32 a.m. Mr. Turner had denied any loss of [consciousness] ("LOC") in the accident but complained of left arm pain and had a laceration with moderate associated bleeding from that extremity with worsening pain on movement.

4. The assessment by the emergency room providers at UCD on August 21, 2009, was that Mr. Turner had an open fracture of the distal left arm; the physicians were concerned with the associated bleeding. Treatment was provided in the ER and a referral was made to the orthopedic service.

. . .

7. After referral to the orthopedic service at UCD, Mr. Turner had an open reduction and internal fixation of the left distal radius fracture with associated split thickness skin graft on August 27, 2009.

8. Following his discharge from UCD Medical Center on August 27, 2009, Mr. Turner came back to the UCD emergency room on September 12, 2009, complaining of increased pain in his arm with reported occasional draining from the wound. He was noted not to have been compliant with the earlier UCD order for dressing changes. Mr. Turner's white blood cell count was 6.7 (within normal range) a finding that does not support any claim by Mr. Turner that he was suffering from an infection in the arm.

. . .

10. The assessment by the UCD physicians on September 12, 2009, was that "an infection is not likely given the laboratory parameters, [the] unimpressive clinical presentation and negative CT with contrast and the patient was urged to keep the following appointment with the Orthopaedic outpatient service at UCD.

. . .

12. Blood cultures taken at UCD upon the patient's return in September 2009, were read showing "no growth" of any infective organism after 5 days of culture.

12

13. Mr. Turner was medically screened at the Yolo County Jail on September 18, 2009, at 0320 hours.

14. A check for current medication prescription for Mr. Turner at the time of his intake at the Yolo County Jail was made on September 18, 2009; the following pharmacies indicated that had no active prescriptions save and except for Oxycodone prescriptions: Raleys, Rite Aide, Longs, and Walgreens.

15. On examination at the Yolo County Jail on September 18, 2009, the dressing on the left arm was changed with the observation of scabbing and "scant" drainage; pain medications were ordered (Ultram) and the dressing was changed with a follow up the nurse practitioner ordered as well.

16. On September 21, 2009, Mr. Turner was seen by the Mid-level provider at the Yolo County Jail and Mr. Turner reported that Ultram and Ibuprofen provided for pain were not working. Mr. Turner also stated that he was not allergic to Ibuprofen, but was allergic to the "plastic coating" on the Ibuprofen. Mr. Turner was referred to Dr. Douglas.

17. Dr. Douglas requested, received, and reviewed the UCD chart relating to Mr. Turner's care on September 21, 2009, and noted the absence of any diagnosed infections at the time of the patient's release from UCD.

18. On September 25, 2009, Dr. Douglas examined the patient, Mr. Turner, and received the report by Mr. Turner that the plate and screws inserted by the orthopedics were, in Mr. Turner's view, "infected." Mr. Turner also requested Ultram be replaced for pain control by Norco. Dr. Douglas following an exam of the patient found no clinical evidence of any infection and that the graft site scar was well healed and without exudate. Dr. Douglas changed the prescription of Ultram to Vicodin.

19. The records for Mr. Turner's medical care during his incarceration at the Yolo County Jail in 2009, reflect and confirm that he was prescribed and used Vicodin without problem or incident, including the absence of any allergic reaction in 2009.

20. On September 27, 2009, Mr. Turner reported at the time of a medical re-admission screening that he had been taking Vicodin and that the Vicodin had been effective in reducing his pain from a reported level of 7/10 to 5/10. Mr. Turner also indicated at that time that he was allergic to Codeine.

21. Daily dressing changes were ordered and performed from September 18, 2009, through September 25, 2009 . . .

22. Based on my review of the medical chart from UCD Medical Center and the CFMG records, the care provided by Dr. William Douglas, M.D., and the entire medical staff at the Yolo County Jail, complied with the

///

> applicable standard of care with which I am familiar as a practicing physician in this state with particular training and experience in treating patients with traumatic injuries including lacerations and broken bones.

(Supp. Decl. of John Levin, M.D., Doc. 78 (internal citations omitted)).

Dr. Levin further stated, "[i]t is my opinion based on the notes made by nurses Carolyn Viera, Janeene Barela, Lisa Miguel-Sevall and Tammy Owens that the care and treatment provided by each of them was within the applicable standards of care." (Supp. Decl. of John Levin, M.D., Doc. 78, at 2).

Defendants have again met their burden to show the nursing staff provided sufficient treatment to plaintiff, including dressing changes, and administering necessary pain medications. The treatment provided again has been determined to be within the applicable standard of care, thus shifting the burden to plaintiff. As the motion is unopposed, plaintiff offers nothing to counter this evidence, or otherwise support his claims. Therefore, the undersigned will recommend that defendants Zil, Carolyn Viera, Janeene Barela, Lisa Miguel-Sevall and Tammy Owens be granted summary judgment.

## IV.  CONCLUSION

The undersigned finds no genuine issue as to any material fact. The defendants have submitted undisputed evidence that the care and treatment plaintiff received was within the applicable standard of care, and did not violate his Eighth Amendment rights. In addition, the claims against Dr. Douglas are barred on the basis of res judicata. Plaintiff failed to oppose the motion, and thus presented no evidence to support his contentions.

Based on the foregoing, the undersigned recommends that:

1.  Defendants' unopposed motion for summary judgment (Doc. 76) be granted;

2.  Judgment be entered in favor of the moving defendants; and

3.  This action continue as to defendants Malagoni, Deneau, Hundl and Brace only.

1    These findings and recommendations are submitted to the United States District
2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days
3 after being served with these findings and recommendations, any party may file written
4 objections with the court.  Responses to objections shall be filed within 14 days after service of
5 objections.  Failure to file objections within the specified time may waive the right to appeal.
6 See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

 DATED:  March 18, 2013

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE